UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH REYNA,                                    Case No. 23-12790
                              Plaintiff,
v.                                               Curtis Ivy, Jr.
                                                 United States Magistrate Judge
JERROD HART and CITY OF
DEARBORN HEIGHTS,
                              Defendants.
_____/

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY
JUDGMENT AND DENYING MOTION TO AMEND**

Plaintiff Joseph Reyna has been a police officer serving Dearborn Heights in

varying capacities since March 2009.  He suffered a heart attack in March 2021,

that requires him to take blood thinner medication to avoid further heart issues or a

stroke.  Following the heart attack, he returned to work on light duty for a short

time then returned to his position as the Accreditation Manager for the Department.

This role was a desk job.  Dearborn Heights later hired Defendant Jerrod Hart as

the Police Chief during February 2022.  Hart decided to pause the Department's

accreditation efforts and notified Plaintiff in June that he would be reassigned to

uniformed road patrol.  Plaintiff showed Defendant a note from a cardiologist

prohibiting Plaintiff from work that would expose him to physical danger, such as

a gunshot wound, because of the risk of bleed while on blood thinners.  Defendant

Hart determined that, because of Plaintiff's restriction, he could not work as a police officer.  Hart placed him on paid administrative leave in June 2022.

Plaintiff sues the City of Dearborn Heights and Defendant Hart for disability discrimination in violation of the Americans with Disabilities Act ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA").

Defendants moved for summary judgment.  (ECF No. 36).  After responding to that motion, Plaintiff moved for leave to amend the complaint a second time to add claims of retaliation under the ADA, PWDCRA, and First Amendment.  (ECF No. 46).

The Court heard argument on both motions on October 8, 2025.  For the reasons below, the motion for summary judgment is **GRANTED** and the motion to amend is **DENIED**.

A.     Disputed and Undisputed Facts

Plaintiff began his employment as a police officer in Dearborn Heights during March 2009 and attained the rank of sergeant in June 2017.  (ECF No. 36-2, PageID.221, Plaintiff's Deposition).  He worked in the Detective Bureau from his promotion until early 2020 when he became the Accreditation Manager.  (*Id.* at PageID.242).  This role was created in an effort to get the Police Department accredited in the State of Michigan.  (*Id.* at PageID.657, 260).  Accreditation is not

2

mandatory, but there are benefits associated with being an accredited police department.  (ECF No. 36-6, PageID.632-33, Defendant Hart's Deposition).

On March 13, 2021, Plaintiff suffered a heart attack. Among other things, he started taking blood thinner medication.  (ECF No. 38-1, PageID.852).  After hospital treatment, Plaintiff began treating with cardiologist Dr. Gowman.  Dr. Gowman issued a letter on Mach 23, 2021, stating that Plaintiff could return to light duty and desk work and that he would need to wear a defibrillator vest.  (ECF No. 50, PageID.2199).  Plaintiff told then-Police Chief Meyers about this restriction who said there would be no issue with Plaintiff continuing to work as the Accreditation Manager as that was a desk job.  (ECF No. 36-2, PageID.285). On May 21, 2021, medical personnel cleared Plaintiff to work without restriction in a document Plaintiff provided the police department.  (ECF No. 36-4, PageID.564, Janet Lucas (Administrative Assistant) Deposition); (ECF No. 36-2, PageID.282).  Plaintiff continued working as the Accreditation Manager, but he had other cardiac episodes during September 2021, when he was diagnosed with atrial fibrillation, and in April 2022.[1]  (ECF No. 38-1, PageID.846; 848).

---

[1] Plaintiff contends that Defendants aware are of the A-Fib diagnosis because he submitted medical documentation as they were created after his heart attack and return to work. There is no direct support in the record showing that Defendants were aware of the diagnosis. Indeed, Janet Lucas who worked in administration testified that she was unaware of any restrictions between September 2021 and June 2022.  (ECF No. 38-6, PageID.1365).  That said, there is a "return to work" document that notes the A-Fib diagnosis signed by a physician.  (ECF No. 50, PageID.2201).

On February 28, 2022, Defendant Hart became the Chief of Police.  Hart

decided to pause the accreditation process because of compliance issues and

shortcuts Plaintiff was taking.  (*See* ECF No. 38-10, PageID.1433; ECF No. 51-1).

Hart notified Plaintiff by letter on June 20, 2022, that he was being reassigned to

the patrol division as Patrol Sergeant effective July 20, 2022.  (ECF No. 38-9,

PageID.1431).  Plaintiff says that Hart told him about the reassignment before

giving him the letter.  During that conversation, Plaintiff said that his doctor does

not want him on road patrol because of the blood thinners.  Hart advised him to get

corroborating documentation.  (ECF No. 38-1, PageID.991).  The day after the

letter, Plaintiff gave Hart a note from Dr. Gowman.  Dr. Gowman said that

Plaintiff should not be placed in situations that could cause harm, "such as trauma,

confrontation, or possibility of being shot."  He invited the reader to contact his

office if there were any questions or concerns.  (ECF No. 36-3, PageID.546).

In Hart's July 7, 2022, notes about the reassignment, he wrote that Plaintiff

told him his doctor did not want him in an assignment where he could be injured or

shot because he was on blood thinners.  (ECF No. 36-9, PageID.703).  He added

that Plaintiff "asked about an accommodation for his condition," and Hart directed

him to human resources.  (*Id.*).  Based on Dr. Gowman's note, Hart thought

Plaintiff could no longer perform the duties of a police officer.  For instance, he

noted concern about Plaintiff's habit of running up and down the stairs because if

he fell he might suffer a brain bleed. He contacted an MCOLES director who advised that Plaintiff's law enforcement authority should be suspended. (ECF No. 36-9, PageID.704). Hart looked at various department policies and discussed the matter with a captain and the Police Commissioner. He concluded that Plaintiff must be placed on non-punitive administrative leave. So on June 22, 2022, Hart suspended Plaintiff's law enforcement authority and took his weapon. (*Id.*; ECF No. 38-5, PageID.1316). On June 24, 2022, Hart asked a police captain to look at CCTV footage in the precinct to see if Plaintiff had been working out or running the stairs. Video showed Plaintiff doing so on June 21 and 22. Hart characterized his actions as "exposing the city to risk" based on the doctor's note. (ECF No. 36-9, PageID.705).

According to Plaintiff, Dr. Gowman "highly encouraged" him to exercise, including running the stairs at work. (ECF No. 38-1, PageID.985).

Dr. Gowman provided a revised letter dated July 12, 2022, which added that Plaintiff's restrictions would not change. (ECF No. 36-3, PageID.547).

No one reached out to Dr. Gowman's office with questions or for clarification.

Jordan Dottor was a sergeant and union president when Plaintiff was placed on administrative leave. He recalled talking to Defendant Hart about Plaintiff. He asked Hart whether the department could put Plaintiff "in an office." (ECF No.

5

38-13, PageID.1695). Hart disagreed; his concern was "if he gets a paper cut or something" because of the blood thinners. Dottor clarified that he could not recall if Hart specifically mentioned a paper cut or a cut more generally. (*Id.* at PageID.1695-96).

Plaintiff emailed Hart, Dottor, and others on February 13, 2023, asking for an update on his status. He wanted to know the City's plan for his employment and mentioned his request for "reasonable workplace accommodations as recommended by [his] cardiologist." (ECF No. 38-17). On March 16, 2023, Plaintiff reported to "First Choice" to see a physician chosen by the City for worker's compensation purposes. This purportedly did not address or assess an accommodation request.

During May 2023, Plaintiff took the promotional test for a lieutenant position. (ECF No. 36-2, PageID.337-38). He is the only person who passed that test (*id.* at PageID.338) so he is the only person who was on the list of those eligible for promotion (*id.* at PageID.340-41). Generally, when there is an opening, the person next on the list gets the promotion. But this list expires after two years. (*Id.* at PageID.342). Plaintiff was not promoted before the list expired.

Plaintiff is still on paid administrative leave with all the benefits he would have if he was actively working as a sergeant. (ECF No. 36-2, PageID.218).

B.     <u>Summary Judgment</u>

6

1.    Governing Standards

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro.*

7

*Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).

      2.    Discussion

Plaintiff alleges that Defendants' conduct amounts to disparate treatment and failure to accommodate in violation of the ADA and comparable Michigan law. Michigan's PWDCRA "substantially mirrors the ADA, so resolving an ADA claim will generally resolve a plaintiff's PWDCRA claim." *Pemberton v. Bell's Brewery, Inc.*, 2025 WL 2539015, at *13 (6th Cir. Sept. 4, 2025) (citation omitted). So the Court will analyze the claims under the ADA.

The ADA prohibits discrimination against a qualified individual based on disability. 42 U.S.C. § 12112(a). "[N]ot making reasonable accommodations" is one form of discrimination. § 12112(b)(5)(A). ADA plaintiffs can prove discrimination with direct evidence or indirect evidence, each having its own analytical framework. Because of the different frameworks, it is "vital" to determine at the outset which test applies. *Blanchet v. Charter Comm., LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). Claims based on an "employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to

accommodate) of discrimination." *Id.* (citation omitted). So the Court will apply the direct evidence test to the failure to accommodate claim.

Under the direct evidence test, Plaintiff has the burden of proving that (1) he is disabled and (2) is otherwise qualified for the job despite his disability "(a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (cleaned up). If Plaintiff meets his burden, then Defendants have the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" the department. *Blanchet*, 27 F.4th at 1228.

Plaintiff does not argue that he is qualified with an essential job function removed, so the Court will address whether he was otherwise qualified with or without a proposed reasonable accommodation.

Disparate treatment claims, on the other hand, are indirect evidence claims based on circumstantial evidence. "Such claims must be evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 619 (6th Cir. 2020). First, Plaintiff must establish that (1) he was disabled, (2) he was otherwise qualified for the job with or without

accommodation, (3) he suffered an adverse employment action, (4) the employer knew or had reason to know of the disability, and (5) similarly situated employees were treated more favorably. *Id.* If successful, the burden then shifts to Defendants to prove that there was a legitimate nondiscriminatory reason for taking the challenged employment action. If Defendants are successful, then the burden shifts back to Plaintiff to show that the proffered reason is pretextual. *Id.*

### a.    Failure to Accommodate

Defendants focus their argument on whether Plaintiff was a qualified individual and whether he requested a reasonable accommodation.

For the second element, Plaintiff must show that he is a "qualified individual with a disability" by showing: (1) that he "satisfies the prerequisites for the position [he holds or desires], such as possessing the appropriate educational background, employment experience, [and] skills . . ."; and (2) that he "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 256 (6th Cir. 2000) (citation omitted).

Defendants argue that Plaintiff was not qualified for any police position requiring an MCOLES license because he cannot perform the essential functions of the job if he is limited to working that would not place him at risk of "trauma, confrontation, or possibility of being shot." (ECF No. 36, PageID.192; ECF No.

36-3, 546)).  Plaintiff counters that he is a qualified individual because he could do the Accreditation Manager job without accommodation while on blood thinners, that he only needed an accommodation when reassigned to road patrol.  (ECF No. 38, PageID.765).

The evidence does not support that Plaintiff is a qualified individual with or without accommodation.  At the hearing and in the motion, counsel explained every position requiring an MCOLES certification, even a job working at the front desk, requires that the employee participate in emergent situations.  For instance, an officer working the front desk at the precinct would need to respond if a violent situation arose inside the lobby or in the parking lot.  Detectives, for example, must "run down leads, . . . come to crime scenes," which exposes the employee to risks of harm.  (ECF No. 43-3, PageID.2011).

Plaintiff attempts to rebut this by noting that Plaintiff was capable of working as an Accreditation Manager while on blood thinners, but he fails to note that during that period his physician (not Dr. Gowman) returned him to work "without restriction."  (ECF No. 36-4, PageID.564; ECF No. 36-2, PageID.282).  So as far as the Department was concerned, if an emergency arose, nothing would prohibit Plaintiff from assisting his co-workers.  But that changed when Dr. Gowman issued his note in June 2022 restricting Plaintiff's activities.

Plaintiff argues that Dr. Gowman's restrictions were not meant to preclude all police work because the restrictions were targeted only at patrol activities. (ECF No. 38, PageID.765).  This interpretation of the letter does not have support in the record and fails to address the fact that an officer, sergeant, detective, or lieutenant may need to respond to an active, dangerous situation even when not on patrol.

What is more, Plaintiff testified that if he was in the precinct and there was an active shooter outside, he would respond even though he is on blood thinners because he would have a duty to respond.  (ECF No. 36-3, PageID.442).  Viewed from a different perspective, Plaintiff is acknowledging that his medication and Dr. Gowman's restrictions preclude him from assisting in an active shooter situation, but he would disregard the restrictions to assist.  Since Plaintiff has not rebutted the evidence tending to show that any MCOLES-certified position requires the officer to assist in those kinds of situations, this is effectively Plaintiff's admission that he is not a qualified individual with or without an accommodator.  Defendants also point out that Plaintiff began the application process for a police officer position in South Carolina during June 2022.  He withdrew from consideration because of concern about his ability to perform the work considering his medical conditions and wanted to see what would happen with his health and if he would be "able to return to road status at some point."  (ECF No. 36-10, PageID.715).  Here, Plaintiff

is at least acknowledging that his medication precludes him from work outside the precinct.

This brings us to the issue of accommodations and whether a reasonable accommodation exists for Plaintiff to return to work. Plaintiff bears the initial burden of proposing accommodations and showing that they are objectively reasonable. *Kleiber v. Honda of Am. Mfg, Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). Plaintiffs have flexibility in how they request an accommodation. *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 564 (6th Cir. 2022) (citation omitted). Still, "[f]or the purposes of a prima facie showing, the plaintiff must merely suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998) (citation omitted); *see also Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) (quoting *Kleiber*, 485 F.3d at 870) ("Then, 'to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position.'"). Once a request is made, the employer has a duty to determine whether there is a job the employee might be able to fill. *Burns*, 222 F.3d at 257. To do this, the employer must engage in an interactive process. *King*, 30 F.4th at 564. That said, the employer need not reassign the employee to a position for which he is unqualified, nor waive legitimate, nondiscriminatory policies, or displace other employees'

rights to consideration to accommodate a disabled individual. *Burns*, 222 F.3d at 257.

Defendants say that Plaintiff had the burden of suggesting an accommodation, but he never did. (ECF No. 36, PageD.195). Plaintiff says there are no magic words needed to request an accommodation, that Dr. Gowman's restrictions were enough to put Defendants on notice that he wanted or needed an accommodation. And his union representative, Jordan Dottor, suggested to Defendant Hart that perhaps Plaintiff could join the Detective Bureau. (ECF No. 38, PageID.768-70). Given this history, Plaintiff argues that Defendants failed to engage in the required "interactive process" to find a suitable accommodation and therefore violated the ADA. (*Id.* at PageID.772).

It is clear that Defendants were on notice that an accommodation was necessary for Plaintiff to return to work, if there was a reasonable accommodation, that is. But the Sixth Circuit requires more from plaintiff beyond merely suggesting the need for an accommodation; they must identify a job or an accommodation and show that they are qualified for the job or that the accommodation is objectively reasonable. It is this second step where Plaintiff's claim fails. As Defendants argue, Plaintiff did not suggest a particular accommodation or attempt to show that an accommodation was objectively reasonable, at least not until responding to their motion for summary judgment.

14

In response, Plaintiff asserts that he "expressed interest in returning to the Detective Bureau" when Defendant Hart first approached him about being reassigned to road patrol.  (ECF No. 38, PageID.755).  But that is not what he said at his deposition.  Plaintiff testified that Hart told him that Hart was reassigning him to road patrol and asked him if he came from the Detective Bureau before working as the Accreditation Manager.  (ECF No. 38-1, PageID.989).  Plaintiff did not testify that he expressed interest in returning to the Detective Bureau.

Plaintiff identified four jobs in his response brief that he says he could perform if placed in a non-patrol position—Detective Bureau Seargeant, Support Services Sergeant, Training Sergeant, and Administrative Lieutenant.  (ECF No. 38, PageID.767-68).  He did not present these positions to Defendants as reasonable accommodations before filing the lawsuit nor did he apply for them as vacancies were announced.  Employers do not have a duty to suggest accommodations to the employee in the first instance, nor do they have a duty to engage in the interactive process during litigation when the plaintiff suggests jobs or accommodations in response to a dispositive motion.

Even considering the four positions named in the response brief, the evidence does not make plain that Plaintiff could perform the essential functions while abiding Dr. Gowman's restrictions.

Plaintiff contends that he could have been on the Detective Bureau because he would not be exposed to dangers as much as he would on road patrol. (ECF No. 36-3, PageID.457-58). Yet Lieutenant Michael Guzowski said that whether a person is a road patrol sergeant or a detective sergeant, the person would have to do all the same duties any law enforcement officer might be required to do. (ECF No. 43-3, PageID.2009). Guzowski said that the detectives "run down leads, . . . come to crime scenes," for example. (*Id.* at PageID.2011). Dr. Gowman's restrictions would preclude Plaintiff from performing these tasks, and Plaintiff has not shown or suggested an accommodation that would be objectively reasonable.

In early 2025, Dr. Gowman answered some questions about Plaintiff's restrictions and specifically addressed the Support Services position. Dr. Gowman reaffirmed the restriction that Plaintiff should be in a position "that would keep him from being shot or injured since he is on blood thinners" and that he would at risk for bleeding if "exposed to injuries such as fighting or weapons." (ECF No. 38-19, PageID.1935, 1938). Dr. Gowman believed that Plaintiff should be back to work now in the Support Services position, one of the three positions Dr. Gowman was considering. (*Id.*). Dr. Gowman checked "unknown" for how long Plaintiff would be unable to perform the essential functions of the two other jobs, Road Patrol Sergeant and Detective Sergeant (this is perhaps a job within the Detective Bureau, addressed above).

Not only did Plaintiff not request to be considered for the Support Services job, (ECF No. 43, PageID.1996; ECF No. 36-3, PageID.447), but the position was filled before Dr. Gowman drafted his April 2025 letter, (ECF No. 43-5, PageID.2030).  And according to Defendant Hart, the person holding the Support Services role is required to go into the field, an activity that Dr. Gowman prohibits Plaintiff from engaging in.  (ECF No. 38-12, PageID.1512).  Lieutenant Guzman said the same thing—every position requires the ability to perform tasks that pose risks of harm.  Plaintiff did not present contrary evidence.  During the hearing, however, Plaintiff's counsel said that Dr. Gowman confirmed that Plaintiff could leave the precinct to assist in emergency situations, but Dr. Gowman did not appear to address emergency deployments.  (*See* ECF No. 38-19).

Plaintiff cited no evidence establishing the essential functions of a Training Sergeant, leaving a jury without a basis to find in his favor.  Here, too, the Court points back to Guzman's testimony that every position requires the ability to engage in tasks that pose a risk of harm.

Last is Administrative Lieutenant.  Plaintiff passed the promotional examination, so academically he was qualified to serve as a lieutenant.  In terms of physicality and exposure to risk, Plaintiff says this specific position was administrative and did not require patrol duties.  (ECF No. 38, PageID.768).  The job posting confirms that "the majority of the work will consist of internal

investigations." (ECF No. 38-22, PageID.1945). Yet among the list of other responsibilities is performing "all duties associated with a DHPD lieutenant." (*Id.*). Though not explicit in the materials the parties cite, presumably it is among their duties to assist in active shooter situations, or interview witnesses, or attend to the scene of a crime. These activities pose the kinds of risks Dr. Gowman wants Plaintiff to avoid. Plaintiff made no effort to show that there is an accommodation to this position that would allow him to have the job and that is objectively reasonable.

In all, there is no question of material fact as to whether Plaintiff was and is a qualified individual with or without a reasonable accommodation. Plaintiff's medical restriction as it currently stands precludes him from working as a police officer with MCOLES certification. Defendants are entitled to judgment on the failure-to-accommodate claims.

   b. Disparate Treatment

As mentioned above, this claim requires Plaintiff to establish that (1) he was disabled, (2) he was otherwise qualified for the job with or without accommodation, (3) he suffered an adverse employment action, (4) the employer knew or had reason to know of the disability, and (5) similarly situated employees were treated more favorably. *O'Donnell*, 833 F. App'x at 619. If successful, the burden then shifts to Defendants to prove that there was a legitimate

nondiscriminatory reason for taking the challenged employment action.  If

Defendants are successful, then burden shifts back to Plaintiff to show that the

proffered reason is pretextual.  *Id.* "A failure to accommodate claim is separate and

distinct from a discrimination claim, and is analyzed differently under the law."

*Konieczka v. Rest Haven Illiana Christian Convalescent Home, Inc.*, 2019 WL

2191256, at *2 (N.D. Ind. May 20, 2019); *see also O'Donnell*, 833 F. App'x at 614

(distinguishing different standards used for failure to accommodate claims and

disparate treatment claims); *Benitez v. Tyson Fresh Meats, Inc.*, 2022 WL

1283087, at *81 (M.D. Tenn. Apr. 28, 2022) ("To state [a disparate treatment

claim] is not to state [a failure to accommodate or failure to engage in the

interactive process claim].").

The parties argue two points—whether Plaintiff suffered an adverse

employment action and whether he was treated differently from similarly situated

employees.

Whether Plaintiff was treated differently from similarly situated employees

is dispositive.  Plaintiff contends that employees without disabilities were treated

more favorably because he "was uniquely stripped of his license, excluded from

communications, denied the interactive process, and subjected to hostile

commentary from Hart – none of which happened to non-disabled employees."

(ECF No. 38, PageID.775).  This argument, however, is unsupported by evidence

and bears no connection to the complaint allegations about disparate treatment. Plaintiff alleged that he was treated differently because he did not get promoted to lieutenant despite passing the promotion examination.  (ECF No. 9, PageID.58-60). That allegation similarly lacks evidentiary support.  Indeed, there is no evidence that anyone was promoted to lieutenant since Plaintiff first went on leave.

Whether the claim is about not being promoted or about the actions asserted in the response brief, Plaintiff has not met his burden.  To show he was treated less favorably than non-disabled employees, he "must do more than make 'generalized and vague allegations' that another employee was treated better." *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (citation omitted).  Plaintiff put forth no evidence that non-disabled employees have not had their licenses taken, or were excluded from communications, etc., or were promoted.  Even suggesting a hypothetical comparator would not have been enough.  *See Booker v. Bd. of Educ. of Toledo Sch. Dist.*, 2024 WL 5440984, at *2 (6th Cir. Dec. 12, 2024) (explaining that the plaintiff failed to establish a prima facie case of disability discrimination because "she did not identify any non-disabled . . . [employee] who received sick leave pay").  Plaintiff's arguments and assertions are far too generalized to meet his burden.  So Defendants are entitled to judgment on the disparate treatment claims.

C.    Motion to Amend

A little more than two weeks after responding to the motion for summary judgment, Plaintiff moved for leave to file a second amended complaint to add claims of retaliation in violation of the ADA and PWDCRA and in violation of the First Amendment.  (ECF No. 46).  He plans to allege that he was retaliated against for requesting a reasonable accommodation, for filing a charge of discrimination with the Equal Employment Opportunity Commission, and/or for opposing an act or practice made unlawful by the ADA or PWDCRA.  (ECF No. 46-1, PageID.2092-94).  He alleges that he was retaliated against in violation of the First Amendment for public comments he made at a Dearborn Heights City Council meeting on January 25, 2022.  (*Id.* at PageID.2096).

Leave to amend the complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  That said, a motion for leave to amend a pleading "may be denied when the motion is the product of undue delay, bad faith, or dilatory motive, amendment would cause undue prejudice to the opposing party, the plaintiff repeatedly failed to cure deficiencies in the complaint with previous amendments, or amendment of the complaint would be futile."  *Springs v. U.S. Dep't of Treasury*, 567 F. App'x 438, 443 (6th Cir. 2014) (citing *Riverview Health Inst. LLC v. Med. Mut. Of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010)).  "'A proposed amendment is futile if the amendment could not withstand a [Fed. R. Civ. P.] 12(b)(6) motion to dismiss.'"  *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir.

2017) (quoting *Riverview Health*, 601 F.3d at 520). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").

Because the motion was filed so late in the litigation, undue delay and prejudice are at the forefront of the Court's considerations. Ordinarily, delay alone is an insufficient reason for denying leave to amend. *See Tefft v. Seward*, 689 F.2d 637, 639 n.2 (6th Cir. 1982) ("Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading."). "At some point, however, delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002).

The Court finds Plaintiff's delay and the resulting prejudice too great to grant the motion. When Plaintiff was deposed in November 2024, he testified about when Defendant Hart put him on administrative leave. He said that the decision was Hart's decision, but also that Hart was the mayor's "puppet" who did

whatever the mayor told him and that Hart and the mayor jointly decided to put him on leave.  (ECF No. 38-1, PageID.1011).  Importantly, Plaintiff mentioned speaking at a city council meeting during January 2022 in favor of Hart's predecessor, suggesting that his leave could result from having spoken at the meeting.  (*Id.* at PageID.1011-12).  Given this testimony, Plaintiff's counsel said at the deposition that they intended to seek leave to amend the complaint to add retaliation claims.  (ECF No. 36-3, PageID.531).  That motion was not forthcoming.

During March 2025, Janet Lucas (administrative assistant at DHPD) and Lee Gavin (former DHPD Chief of Police) were deposed.  Lucas testified that Hart removed the Accreditation Manager position in retaliation for Plaintiff's comments at the city council meeting.  (ECF No. 38-6, PageID.1333).  Gavin testified that Plaintiff was left on leave for as long as he was in retaliation for speaking at the city council meeting.  (ECF No. 38-3, PageID.1255).

Then, in July 2025, two witnesses came forward to support the notion that Plaintiff was retaliated against.  Sergeant Mohamad Bazzy says in his affidavit that Hart and others often discussed getting rid of Plaintiff by pushing him out after he spoke at the city council meeting and because of his work investigating Mr. Fawaz, a friend of the mayor's, who was accused of sexual contact with his daughter. (ECF No. 46-2).  Former Interim Chief of Police Hussein Farhat says Plaintiff's

administrative leave was "handled with unusual scrutiny and hostility" because of the investigation into Fawaz.  (ECF No. 46-3).  Farhat was told that Plaintiff was racist.  The retaliation Farhat referenced was letting the lieutenant promotion list expire without promoting Plaintiff.[2]

Because Bazzy and Farhat came forward only days before the motion was filed, and they could not have known about their potential testimony before they came forward, Plaintiff insists there was no undue delay.  (ECF No. 46, pageID.2064).  And without their affidavits, Plaintiff says he had no reasonable basis for his claims because Lucas and Gavin were not at the city council meeting.  (*Id.* at PageID.2069).  Thus, he argues that the motion to amend should be granted and a limited period of discovery should commence on the new claims.

Given Plaintiff's, Lucas's, and Gavin's testimony about retaliation for speaking at the city council meeting, it is difficult to credit Plaintiff when he says he could not have sought leave until Bazzy and Farhat came forward.  Bazzy and Farhat did not add new information about Plaintiff's involvement in the city council meeting nor did they bring a new theory of retaliation out of that meeting.  Plaintiff had the facts necessary to seek leave to amend based on that theory in March 2025, well before the close of discovery and the passing of the dispositive

---

[2] Plaintiff did allege retaliation based on his investigation into Fawaz.  (*See* ECF No. 46-1, PageID.2091-99).

motion deadline, and had he done so, he could have spent the discovery period searching for evidence in support of the claim.  At this point, the delay is undue.

Similarly, the notion that Plaintiff was placed on leave, stripped of his MCOLES license, and removed from department communications was retaliation for his disability cannot seriously be considered "new" and available only after Bazzy and Farhat came forward.  Neither witness mentioned retaliation for anything related to Plaintiff's disability or EEOC charge.  Plaintiff has had sufficient facts to amend his complaint to a claim for disability-related retaliation since the discovery period began.

The Court acknowledges Plaintiff's point that Bazzy and Farhat, and perhaps others, are afraid to come forward for fear of their own retaliation so they did not come forward until recently.  That said, there simply was sufficient information to assert the claims since the onset of the litigation and time for discovery to learn more about the claims.  Had Plaintiff or his counsel learned of a potential witness who was afraid of retaliation, there are tools available to protect those witnesses, such as protective orders or filing documents under seal (with the Court's leave to do so).

Not only did Plaintiff unduly delay in bringing the motion, Defendants will face significant prejudice if the motion is granted at this late stage.  The case is nearly two years old.  If granted, they will be required to engage in additional

25

discovery and additional motion practice all after a complete period of discovery was completed and after their motion for summary judgment was briefed, heard, and ruled on.  (ECF No. 47, PageID.2135).  It is unlikely that all of this and trial, if needed, will be completed before the case turns three years old.  Defendants have a legitimate and understandable interest in seeing the end to the lawsuit filed against them.

Granting leave would also place an unwarranted burden on the Court.  Just as it is prejudicial to Defendants to reopen discovery and create a new dispositive motion deadline now, it is prejudicial to the Court to grant summary judgment on the original claims but keep the litigation open to litigate new claims.  For these reasons, the motion is **DENIED**.[3]

**IT IS SO ORDERED**.

Date: October 9, 2025                          s/Curtis Ivy, Jr.
                                               Curtis Ivy, Jr.
                                               United States Magistrate Judge

---

[3] Given the undue delay and prejudice, the remaining factors including futility will not be addressed.

26